**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CHARLES L. REYNOLDS, ) | |
| Plaintiff, ) | |
| v. ) | CIVIL ACTION NO. 3:04-232 |
| ) | |
| METROPOLITAN LIFE ) | JUDGE KIM R. GIBSON |
| INSURANCE CO., ) | |
| Defendant. ) | |

## MEMORANDUM OPINION and ORDER

**GIBSON, J.**

### I. INTRODUCTION

Now before the Court is Defendant's Motion for Summary Judgment (Document No. 46),

Plaintiff's Response thereto (Document No. 49), and Defendant's Reply (Document No. 60). Also for

consideration are Defendant's Motions to Strike and for Rule 11 Sanctions. Document Nos. 57 & 39,

respectively. Charles Reynolds ("Reynolds" or "Plaintiff") filed his original Complaint on September

24, 2004. Document No. 1. In his subsequently-filed Amended Complaint, Plaintiff alleged age

discrimination in violation of the Age Discrimination in Employment Act (hereinafter "ADEA"), 29

U.S.C. § 621, *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 PA. C.S. § 951, *et seq.*,

as well as six violations of Pennsylvania common law: breach of contract; tortious interference with

contractual relations; tortious interference with prospective contractual relations; defamation; false light;

and invasion of privacy. Document No. 11. The Court's jurisdiction over Plaintiff's ADEA claim is

proper pursuant to 28 U.S.C. §§ 1331; the Court asserts supplemental jurisdiction over the state-law

claims according to 28 U.S.C. § 1367. Venue is appropriate under 28 U.S.C. § 1391(b).

Metropolitan Life Insurance Company ("MetLife" or "Defendant") answered on January 3,

2005, and filed the motion *sub judice* on April 14, 2006, along with a Motion for Sanctions Pursuant to Rule 11 (Document No. 39). The Opposition was timely filed on May 12, 2006, and included in the supporting documents an affidavit from Plaintiff. Defendant moved to strike that affidavit on May 26, 2006 (Document No. 57), and replied to Plaintiff's Opposition that same day. For the reasons that follow, the Court will grant all three motions.

## II. BACKGROUND AND MATERIAL FACTS NOT IN DISPUTE[1]

In the fall of 2003, Plaintiff was a Senior Financial Services Executive with MetLife, capping a thirty year career in Defendant's employ. On August 25, 2003, Plaintiff, along with several other MetLife employees, attended a day of business meetings at the Seven Springs Resort in Champion, Pennsylvania. The event was followed by a company-sponsored cocktail party featuring dinner and an open bar. Afterwards, the party continued at the Resort's Bavarian Lounge and a game room on the premises where several revelers played pool and video games. Among those enjoying the evening were Plaintiff and colleague Kay Sayavong ("Sayavong").

Days later, MetLife received a written complaint from Sayavong alleging that Reynolds had sexually harassed her in the game room. This was not the first time Plaintiff had been accused of sexual harassment. In 1999 another female MetLife employee complained about Reynolds' inappropriate behavior. While the ensuing investigation did not reveal conclusive evidence of sexual harassment, it found that Plaintiff had behaved inappropriately. Reynolds was removed from a management position

---

[1] The factual history recounted in this section is based upon Statements of Material Facts submitted pursuant to Local Rule 56.1, any objections and counter-statements thereto, and any consistencies between the Parties' filings. Although no indentations or marks are used, the Court has, where appropriate, directly quoted the language of the Parties. Any fact not present here has been deemed by the Court to be immaterial, lacking adequate evidentiary support, disputed for purposes of the present Motion, or argumentative and not factual. Additionally, the non-moving Party concedes anything in the movant's Statement of Material Facts to which the non-moving party does not directly respond. L.R. 56.1(E). Some facts may not be in the same form as presented because the Court has concluded that the record did not support the fact as submitted.

2

as a result of the 1999 incident.

Defendant assigned the investigation of Sayavong's claims to Human Resources Specialist Kim Edson ("Edson"), a twenty-year MetLife employee who had conducted hundreds of similar investigations. Edson interviewed six individuals who were at the function, including one witness who made additional complaints about Plaintiff's behavior. Edson's report ultimately recommended that MetLife immediately terminate Reynolds' employment. Acting on this recommendation, MetLife Vice President Brian Breneman ("Breneman") conferred with in-house counsel and subsequently directed that Plaintiff be fired. Reynolds was notified on September 28, 2003. He was fifty-eight years old at the time.

Reynolds did not have a contract with MetLife for a specified term of employment. Defendant published multiple "at-will" disclaimers, both in manuals and in documents that Reynolds signed. Throughout his employment, Plaintiff understood that his employment could be terminated at any time. Reynolds' termination came some time after he had informed MetLife of his intent to retire in 2004. Some former MetLife employees receive continuing benefits as Senior Partners after they retire. Senior Partner contracts require these retirees to maintain a minimum production level of approximately $5,000 in commissions each year and maintain normal licensing. In return, Senior Partners can receive various commissions and residual payments. Plaintiff estimated he might have earned over $3,000,000 in such payments if he had received a Senior Partner contract. Plaintiff was informed upon his termination that his interest in commissions would end; he was not offered a Senior Partner contract.

After firing Reynolds, Defendant sent out a letter informing clients that Plaintiff had been terminated and was no longer a MetLife agent. The letter also instructed the recipient to contact MetLife if any competitor tried to persuade them to replace their existing MetLife insurance policies.

3

As required by the National Association of Securities Dealers, Defendant also notified that organization that Reynolds was no longer employed with MetLife.

## III. ANALYSIS

### A. Motion to Strike

At the summary judgment stage, "the non-moving party must produce admissible evidence containing 'specific facts showing that there is a genuine issue for trial.'" *Vitalo v. Cabot Corp.*, 399 F.3d 536, 542 (3d Cir. 2005) (quoting FED. R. CIV. P. 56(e)). The Court may strike portions of an affidavit that present inadmissible hearsay. *Shelton v. Univ. of Med. & Dentistry*, 223 F.3d 220, 226 n.7 (3d Cir. 2000); *Aronson v. Peoples Natural Gas Co.*, 180 F.3d 558, 563 n.2 (3d Cir. 1999). Upon receiving Plaintiff's Response to the Motion for Summary Judgment, MetLife moved to strike Reynolds' supporting affidavit, arguing that the document suffered from both general and specific defects. Defendant generally avers that the affidavit "is not based on Plaintiff's personal knowledge, and should be stricken in its entirety." Document No. 57, p. 2. More particularly, MetLife objects to the admissibility of specific declarations within the affidavit on grounds of hearsay and speculation. Plaintiff has not opposed the Motion to Strike.

According to FED. R. EVID. 801, "[h]earsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Under Rules 802 and 805, hearsay and double hearsay are inadmissible under most circumstances. Though there are several exceptions to the restriction on out-of-court-statements, Plaintiff's disinterest in defending his own affidavit does little to inspire an exhaustive review of the applicable law. Fortunately, such thoroughness is unnecessary, as even a cursory examination of Reynolds' affidavit reveals that it provides little admissible evidence. For example, Plaintiff avers that "[a] prominent

4

business leader . . . told me shortly after I was fired, that he was given information abut my having been fired and the reason for such firing. . . ." Document No. 50-22, ¶ 1. Additionally, "my partner . . . was contacted by Defendant, and several promises and threats were made. . . ." *Id.* at ¶ 3. "[A] friend of mine told me that approximately two weeks after I was terminated, he heard that I was fired for alleged sex offenses." *Id.* at ¶ 4. "Darrell Pullman . . . was told by Jeffery Romo . . . [and] that I had been fired, that I had done 'lewd things' with a pool stick. . . ." *Id.* at ¶ 5. "[A] friend and client of mine told me that he had heard rumors about why I was fired. . . ." *Id.* at ¶ 6. Reynolds also avers that various individuals "told me that they received the letter from MetLife . . . and that they thought the letter was derogatory. . . ." *Id.* at ¶ 7.

The Court cannot conclude that any of these assertions fall within the categories of admissible hearsay. They are not party admissions or declarations against interest. The statements are not offered to establish the declarants' mental or physical condition or Plaintiff's state of mind. These are not excited utterances or testimony of any kind. No other traditional common law or modern exception applies. Affiant is relaying unsworn, out-of-court, third-party statements offered for the purpose of establishing the truth of their content. Accordingly, the Court will strike Paragraphs 1, 3, 4, 5, 6, and 7 as inadmissible hearsay under FED. R. EVID. 802 and 805. *Easton v. Bristol-Myers Squibb Co.*, 289 F. Supp. 2d 604, 613 n.8 (E.D. Pa. 2003). Additionally, the Court will not consider Paragraph 2 of the Reynolds affidavit, as it states nothing more than speculation that Plaintiff "was not placed on the main board of the CSC Bank because some of the Board members had heard of my termination and did not feel comfortable with my being appointed. . . ." Document No. 50-22, ¶ 2. *See Shelton v. Univ. of Med. & Dentistry*, 223 F.3d 220, 227 (3d Cir. 2000) ("Such speculation is insufficient to raise a fact issue precluding summary judgment."); *Boykin v. Bloomsburg Univ.*, 893 F. Supp. 400, 403 (M.D. Pa.

1995) (noting the evidentiary defectiveness of speculation).

## B. Motion for Summary Judgment

Summary judgment is appropriate where "there is no genuine issue as to any material fact." FED.
R. CIV. P. 56. "An issue of material fact is genuine if the evidence is such that a reasonable jury could
return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106
S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (citation omitted). Material factual disputes are those "that might
affect the outcome of the suit under governing law." *Id.* On a motion for summary judgment, the
moving party must first "identify[] those portions of the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate
the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.
Ct. 2548, 91 L. Ed. 2d 265 (1986). To defeat the motion, "an adverse party may not rest upon the mere
allegations or denials of his pleading." *Id.* at 321 n.3. Instead, it must use evidence to "set forth specific
facts showing that there is a genuine issue for trial." *Id.* "The evidence of the nonmovant is to be
believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255, 106
S. Ct. at 2513, 91 L. Ed. 2d at 216.

### 1. Plaintiff's ADEA and PHRA Claims

The ADEA protects workers from adverse employment decisions that are motivated or
determinatively influenced by the protected trait of age. *Reeves v. Sanderson Plumbing Prods., Inc.*,
530 U.S. 133, 141, 120 S. Ct. 2097, 2105 147 L. Ed. 2d 105, 116 (2000). According to 29 U.S.C. §
623(a), it is unlawful for an employer "to discharge any individual or otherwise discriminate against any
individual . . . because of such individual's age." Claims of discrimination are analyzed according to
the familiar burden-shifting paradigm that the Supreme Court first explicated in *McDonnell Douglas*

6

*Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). *Matczak v. Frankford Candy & Chocolate Co.*, 136 F.3d 933, 938 (3d Cir. 1997) (applying *McDonnell* to ADEA claims that proceed without the benefit of direct evidence of discrimination). Under *McDonnell*, an ADEA claimant must first make a *prima facie* case of discrimination. Once done, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the action in question. *McDonnell Douglas Corp.*, 411 U.S. at 802-03, 93 S. Ct. at 1824-25, 36 L. Ed. 2d at 678. Assuming MetLife so meets its burden at step two, Reynolds can only recover if he establishes that the proffered reasons are in fact pretextual. *Id.* at 804, 93 S. Ct. at 1825, 36 L. Ed. 2d at 679. Pennsylvania courts have adopted this framework for analyzing claims of age discrimination brought under the PHRA. *Simpson v. Kay Jewelers*, 142 F.3d 639, 643-44 & n.4 (3d Cir. 1998); *Fairfield Twp. Volunteer Fire Co. No. 1 v. Commonwealth*, 609 A.2d 804, 805 (Pa. 1992).

Generally speaking, "[t]he burden of establishing a *prima facie* case of disparate treatment is not onerous." *Sheridan v. E.I. Dupont de Nemours & Co.*, 100 F.3d 1061, 1084 (3d Cir. 1996) (citing *Tex Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)). At this first step in *McDonnell*, Reynolds must establish four elements: 1) that he is over forty years old, and is thus a member of the protected class; 2) that his employment was terminated; 3) that he was qualified for the position from which he was terminated; and 4) that the circumstances of his firing give rise to an inference of unlawful discrimination. *Morrissey v. Luzerne County Cmty. Coll.*, 117 Fed. Appx. 809, 812 (3d Cir. 2004) (nonprecedential opinion) (citing *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403 (3d Cir. 1999).

MetLife's motion points to the lack of evidence that a younger, similarly-situated employee was treated more favorably and argues that Reynolds cannot meet the fourth element of the *prima facie* case.

7

Document No. 44, p. 7. Defendant specifically claims that any similarity between Plaintiff and the one proposed comparator, former MetLife employee Gary Drayer ("Drayer"), ended when Plaintiff was investigated a second time: "Just like Reynolds, Drayer was not discharged for his first offense. Reynolds was discharged only after he committed a repeat offense. . . ." *Id.*

Plaintiff insists that Drayer not only serves as an adequate comparator, but that, as such, embodies the requisite circumstances suggesting discrimination. Because MetLife did not conclude in 1999 that Reynolds had committed sexual harassment, the argument goes, it was as a first-time offender that Plaintiff was terminated in 2003. Document No. 49, p. 18. Plaintiff complains that his discovery was limited to the files of MetLife employee considered "repeat sexual harassment offenders," thereby preventing him from further developing greater evidence on the treatment of younger colleagues.

Plaintiff has not moved for a reconsideration of the December 14, 2005, Order denying his Motion to Compel, in which the Court found that "sufficient evidence exists that Plaintiff was subject to investigation by Defendant for alleged sexual harassment prior to the 2003 incident" and structured discovery accordingly. Document No. 35, p. 2. MetLife's investigation into the 1999 accusations against Plaintiff prevents the Court from considering Drayer similarly situated to Reynolds. Plaintiff's inability to identify a proper comparator within the scope of discovery is thus fatal to any argument that MetLife treated any similarly-situated younger employee more favorably.

Nonetheless, Plaintiff suggests that Defendant has read circuit precedent in an overly narrow manner, as circumstances besides the treatment of younger employees can raise the inference of discrimination. Specifically, Reynolds argues that he informed MetLife within a year of his termination that he intended to retire in June 2004; that Defendant conducted a "seriously-flawed investigation" into the 2003 sexual harassment accusations; and that the company had other forms of discipline available

8

at that time. Combined with the fact that MetLife retirees often receive continuing benefits, Defendant's knowledge of Reynolds' imminent retirement, the inadequacy of its investigation, and its choice of such a severe punishment all suggest to Plaintiff an ulterior motivation for his termination. Document No. 49, pp. 18-19.

The treatment of a comparator is not the only way to state a *prima facie* case of age discrimination. *Waldron v. SL Indus.*, 56 F.3d 491, 494 n.3 (3d Cir. 1995) (noting that "the precise elements of a plaintiff's *prima facie* case may vary with the particular circumstances" (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 n.14, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973))). Furthermore, with deference to the light burden ADEA claimants must initially carry under *McDonnell*, and considering certain circumstances surrounding Plaintiff's termination, the Court could find that Reynolds has shifted the burden to Defendant. It is undisputed that Plaintiff was "one of the top producing sales representatives in the Pittsburgh-Johnstown-West Virginia region." Document No. 61, ¶ 34. One Managing Director called his performance "excellent" and his sales results "quite good." Document No. 50, Exh. 3, p. 1. Defendant allegedly knew of Reynolds' impending retirement and the money he would collect from MetLife thereafter.

The Court need not decide whether Plaintiff has established a *prima facie* case, however, for even if he did so, Reynolds could not survive summary judgment. Defendant has carried its burden by proffering a legitimate nondiscriminatory reason for the employment action challenged in this lawsuit: Plaintiff's sexual harassment of a MetLife colleague. Plaintiff's case collapses for want of evidence supporting his arguments that this reason was in fact a pretext for discrimination.

An ADEA plaintiff at the final *McDonnell* step faces the difficult burden of showing "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's

9

proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence.'" *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 467 (3d Cir. 2005) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994)). Plaintiff must produce evidence that the employer's proffered reason was "either a post hoc fabrication or otherwise did not actually motivate the employment action." *Id.* (citing *Fuentes*, 32 F.3d at 764). "[P]retext is not shown by evidence that 'the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.'" *Id.* (citing *Fuentes*, 32 F.3d at 765).

Plaintiff's first attempt to puncture MetLife's explanation for his termination assumes the form of denial: Because Reynolds did not sexually harass anyone, his firing must be an act of discrimination. Under *Fuentes*, this argument might succeed if, in light of the supporting evidence, Defendant's proffered reason was not credible. *Fuentes*, 32 F.3d at 766. But simple denials do not of themselves create triable issues and Plaintiff's evidence does nothing to undermine the credibility of MetLife's conclusion that he sexually harassed another employee. Thus, it is unavailing that Plaintiff offers the testimony of former colleague Whitney Stricklin, who stated that he saw no inappropriate behavior on the night in question and implicitly refuted Sayavong's testimony that he was asked to intercede on her behalf. *Compare* Sayavong Dep, Document No. 50-7, p. 3 ("I told Whitney. . . . I said, Charlie is bugging the crap out of me. . . . Whitney told [Plaintiff] to stop. . . he told him, Now that's enough Charlie, let's play pool.") *with* Stricklin Dep., Document No. 50-13, pp. 6-7 (**Q:** Do you recall [Sayavong] saying anything to anyone that evening, saying anything to Mr. Reynolds? **A:** To Mr. Reynolds? **Q:** Right. **A:** No. . . . **Q:** And you did not see [Reynolds] do anything inappropriate that night? **A:** No, I did not."). Similarly, Plaintiff gets little help from the testimony of Agency Sales

10

Director Dean Mavrogianis, who did not see Reynolds act inappropriately. Document No. 50-12, p. 3. *But see id.* (testimony from Mavrogianis that he wasn't in the pool room, where the harassment supposedly occurred).

The question is not whether the Court can find beyond a reasonable doubt that Plaintiff committed sexual harassment. The inquiry in this case is whether a legitimate basis for Reynolds' termination was a *post hoc* explanation or otherwise unworthy of credence. That no one witnessed any inappropriate conduct might, depending on the circumstances, suggest that sexual harassment was a wholly implausible pretext for firing Plaintiff. But the Court need not consider such a possibility, for the testimony of two attendees that they witnessed no harassment does not nullify the ample testimony from people who did. Kay Sayavong reported to Defendant that Reynolds harassed her. Document Nos. 50-2 & 50-7. Jimmy Dunlavy told Edson that he asked Plaintiff to stop touching Sayavong. Document No. 50-8. Nicole Demartino reported that Reynolds behaved inappropriately toward her and "act[ed] as if the pool stick was his penis. [Sayavong] kept walking by and he poked her with it." Document No. 50-11. Butch Mounts corroborated this account. Edson herself testified that the investigation into the incident revealed what "[i]n my mind . . . was ample evidence that there was way too much physical unwelcome contact" between Sayavong and Reynolds. Document No. 45-8, p. 6. Edson felt "[v]ery confident" that Plaintiff sexually harassed a female colleague and recommended that "terminating [Reynolds'] employment with MetLife would be appropriate." Document No. 45-13, p. 2. MetLife Senior Vice President Brian Breneman testified that "there certainly was evidence that there was inappropriate behavior that evening" and that, as a consequence, there was a discussion "as a team and with our partners from human resources/legal; and we came to the conclusion that as a company, we needed to terminate [Reynolds'] employment." Document No. 45-6, p. 6. Defendant reasonably

11

construed the information before it and made a good-faith decision on that basis.

Undeterred, Plaintiff next criticizes the method by which MetLife obtained that information, arguing that "Defendant seized on a hot-button allegation . . . and forged ahead with a seriously-flawed investigation, with the conclusion pre-determined. . . ." Document No. 49, p. 19. The Court has no interest in reviewing the extent to which Defendant's internal investigation was fair, thorough, balanced, or faithful to corporate policy. Even if Edson conducted a flawed investigation that MetLife exploited to reach a desired conclusion, there is no indication that it was a pretext for age discrimination. *Geddis v. Univ. of Del.*, 40 Fed. Appx. 650, 653 (3d Cir. 2002) (nonprecedential opinion) (suggesting that "the lack of investigation alone does not establish that the [defendant] fired [plaintiff] based on discriminatory reasons").

To add some dimension to his argument, however, Reynolds insists that pretext can be discerned from the combination of MetLife's inadequate investigation and its knowledge that if Reynolds retired, he might collect various benefits for years to come as a Senior Partner. Plaintiff argues that he was fired to save Defendant the cost of these retirement benefits, which serve in this case as a proxy for age.

In order to serve as a proxy for age, retirement rights must vest when the recipient reaches a certain age. *Erie County Retirees Ass'n v. County of Erie*, 220 F.3d 193, 211 (3d Cir. 2000). Although years of service may correlate to age, the two are analytically distinct for purposes of establishing a pretext of discrimination. *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 611, 113 S. Ct. 1701, 123 L. Ed. 2d 338 (1993). The evidence indicates that the renewal commissions and trail payments that Senior Partners enjoy are based not on age, but on the amount of business the recipient generates. Document No. 50-5, pp. 23-24. Therefore, like pension rights determined by years of service, such payments cannot serve as a proxy for age. Assuming MetLife terminated Reynolds to avoid paying these benefits,

12

its motivation would not qualify as discrimination within the ambit of the ADEA.[2]

Furthermore, putting aside the legal flaws in Plaintiff's argument, Reynolds has not shown any evidence that his termination actually saved MetLife money. He only suggests that his decision to retire may have influenced his termination. Document No. 49, p. 19. Speculation, however, does not prevent summary judgment. "'[I]nstead, it creates a false issue, the demolition of which is a primary goal of summary judgment.'" *Lexington Ins. Co. v. W. Pa. Hosp.*, 423 F.3d 318, 333 (3d Cir. 2005) (quoting with approval *Hedberg v. Ind. Bell Tel. Co., Inc.*, 47 F.3d 928, 932 (7th Cir. 1995)). It does not help Plaintiff that his termination "denied [him] the opportunity to retire and to enjoy the compensation and benefits of a Senior Partner contract." Document No. 61-1, ¶ 31. Nor does it help that some Senior Partners receive renewal commissions and trail payments. *Id.* at ¶ 32. John Paros, a MetLife Agency Director, testified that Senior Partner status, renewal commissions, and trail payments are not rights of employment. Rather, a MetLife retiree must be approved for a Senior Partner Contract and perform at some minimum level to receive commissions and trail payments. Document No. 50-5, pp. 21-25.

It is therefore clear that at the time of his termination, Plaintiff had no entitlement to Senior Partnership or ongoing commissions and trail payments. Thus, even if MetLife reasonably predicted that Plaintiff would eventually hold Senior Partner status and receive continuing benefits, there remained the possibility that he might not. Assuming that these benefits could serve as a proxy for age, Reynolds cannot show that his terminations denied him any entitlement to them. Plaintiff is therefore unable to marshal the evidence in any way that demonstrates a genuine issue concerning MetLife's

[2] The evidence also indicates that Reynolds is receiving pension payments. Document No. 61-6, p. 5. Thus, any reduction in those payments that occurred as a result of being fired in 2003 instead of retiring in 2004 was necessarily produced by the reduction in service years. Therefore, neither can the effect of Plaintiff's termination on his pension rights serve as a proxy for age.

proffered reason for his termination.

Because MetLife made a reasonable employment decision and Plaintiff is unable to demonstrate how the proffered nondiscriminatory reason for his termination was pretextual, Reynolds' allegation of age discrimination cannot survive Defendant's Motion for Summary Judgment.

**2. Plaintiff's Breach-of-Contract Claim**

In the Amended Complaint, Plaintiff alleges that he "had a contract with Defendant whereby it would pay Plaintiff not only a salary, but also bonuses, commissions, renewals, asset trails, reimbursement of office expenses, and a wide array of benefits and other forms of compensation." Document No. 11, ¶ 21. In its request for summary judgment, MetLife asserts that because Reynolds' employment was at-will, it could fire him for any reason and at any time.

Plaintiff does not contest his employment status. Rather, the gist of his contract argument is apparently that a company may not stop compensating an at-will employee just because it no longer employs that person. Although the Court agrees that termination appears to be a valid reason to stop paying an at-will employee's salary, the reason why Plaintiff's breach-of-contract claim cannot survive is instead the complete lack of supporting evidence.

Reynolds claim stands on two legs. First, he asserts that Defendant failed to pay him "all amounts owing up to the present date." Second, MetLife allegedly committed "anticipatory breach, in that it has indicated by its actions that it will not pay to Plaintiff those amounts that would ordinarily become due in the future." Document No, 49, p. 20. Plaintiff again relies on the Senior Partner contracts, renewal commissions, and trail payments that termination denied him. Regardless of who becomes a Senior Partner, what benefits Senior Partners sometimes enjoy, or the typical advantages of retiring instead of being fired, without evidence that Plaintiff was anything but an at-will employee or

14

was entitled to particular benefits, the Court cannot help but find that MetLife did not owe Reynolds any contractual duty.

## 3. The Remaining State Claims

According to Plaintiff, his "other common law claims . . . are based on Defendant's unnecessary and harmful communications to policy-holders formerly serviced by Plaintiff." Document No. 49, p. 21. Rather than present evidence that demonstrates the way in which his lawsuit satisfies the requirements of the law that governs his five remaining counts, Reynolds instead states simply that "the Paros letter [informing MetLife clients that Plaintiff had been terminated] was sent to 1,000 to 2,000 policyholders . . . and thus had a wide publication, and not only the potential to cause serious harm to Plaintiff's reputation but also the potential to cause serious damage to Plaintiff's future business opportunities." *Id*. In support of this allegation, Plaintiff cites to various averments made in his Statement of Material Facts: Paragraphs 12, 13, 18, and 19 from his Response to Defendant's Statement of Facts, and Paragraphs 41 through 45 of his own Statement. Document No. 49.

Assuming that these citations are a convenient shorthand for the evidentiary record relied on in those paragraphs, the Court must still grant summary judgment in Defendant's favor as to all the remaining counts. Other than deposition testimony that MetLife's letter was sent to one or two thousand recipients, Factual Statements 12, 13, 18, 19, and 41 cite to nothing more than the hearsay included in Reynolds' stricken affidavit. The only admissible evidence that the Court can locate to support Plaintiff's case is Agency Director Paros' testimony "that one of Plaintiff's customers called and was upset about the wording of the letter." Document No. 50-5, pp. 18-19.

Plaintiff's causes of action are governed by standards to which his case must adhere. The claim for tortious interference with contractual relations requires Plaintiff to demonstrate that he had an

15

existing contract with a third party, that MetLife interfered with the performance of that contract without being privileged to do so, and that he suffered some economic loss as a result. *Nat'l Data Payment Sys. v. Meridian Bank*, 18 F. Supp. 2d 543, 549 (E.D. Pa. 1998). To state a claim for tortious interference with prospective contractual relations, Plaintiff must show a specific prospective contractual relationship, Defendant's intent to prevent that relationship to Plaintiff's detriment without justification, and the resulting damages. *See Zions First Nat'l Bank, N.A. v. United Health Club, Inc.*, 704 F.2d 120, 125 (3d Cir. 1983); *JHNY Corp v. Dana Corp.*, No. 05-2829, 2006 U.S. Dist. LEXIS 52062, at * (E.D. Pa. Apr. 14, 2006). The defamation action requires Plaintiff to prove

(1) the defamatory character of the communication; (2) publication by the defendant; (3) its application to the plaintiff; (4) understanding by the recipient of its defamatory meaning; (5) understanding by the recipient of it as intended to be applied to the plaintiff; (6) special harm to the plaintiff; and (7) abuse of a conditionally privileged occasion.

*Miketic v. Baron*, 675 A.2d 324, 327 (Pa. Super. Ct. 1996). A publication that might otherwise be defamatory is subject to a conditional privilege "if the publisher reasonably believes that the recipient shares a common interest in the subject matter and is entitled to know." *Id.* at 330 (citations omitted). The claim for false light depends on Reynolds' ability to show that MetLife publicly placed him in a false light that would be highly offensive to a reasonable person and that MetLife "had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which [Reynolds] would be placed." *Sharp v. Whitman Council, Inc.*, No. 05-4297, 2006 U.S. Dist. LEXIS 54582, at **33-34 (E.D. Pa. Aug, 7, 2006) (citations omitted). Finally, Pennsylvania's tort for invasion of privacy "is comprised of four analytically distinct torts: (1) intrusion upon seclusion; (2) appropriation of name or likeness; (3) publicity given to private life; and (4) publicity placing a person in a false light." *12th St. Gym v. Gen. Star Indem. Co.*, 93 F.3d 1158, 1163 n.5 (3d Cir. 1996).

16

Having moved for summary judgment, Defendant has placed the onus on Plaintiff to put forth evidence suggesting a genuine issue of material fact that is suitable for trial. The elements recited above provide guidance for what facts are material and what evidence is relevant. Plaintiff's highly general argument and his inability to reference the evidentiary record in support of his claims compels the Court to summarily enter judgment in Defendant's favor as to all counts.

This would be the case even if the Court were to consider the hearsay and speculation stricken from the record. Plaintiff admits that he was terminated for sexual offenses and he concedes each of the factual statements set forth in the MetLife letter to policyholders. Document No. 50-6, pp. 234-40. Evidence that third parties knew the circumstances of Plaintiff's separation from MetLife does not by itself raise triable issues of fact. Thus, even taking into account the entire record, Plaintiff's failure to adduce evidence that addresses each element of the claims in his Complaint makes summary judgment for MetLife proper.

## C. Defendant's Motion for Sanctions

Assessing the anemic evidentiary record underlying Plaintiff's claims, on April 14, 2006, MetLife filed a motion under FED. R. CIV. P. 11(c) for sanctions against Reynolds and his counsel, James H. Logan ("Logan"). Document No. 39. According to Defendant, "Reynolds and his counsel should have known at the close of discovery that there is no evidentiary support whatsoever for any of Reynolds' claims, in violation of Rule 11(b)(3)."[3] *Id.* at 1. Defendant complied with Rule 11's safe

---

[3] In pertinent part, Rule 11(b) reads:

By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,–

(1) it is not being presented for any improper purpose. . .;

(2) the claims, defenses, and other legal contentions therein are warranted by existing law

17

harbor provision by noticing Plaintiff of its intent to seek sanctions if Reynolds did not voluntarily

withdraw his suit within three weeks. Document No. 40-2.

The propriety of sanctions is left to the sound discretion of the district court. *DiPaolo v. Moran*,

407 F.3d 140, 144 (3d Cir. 2005) (citing *Garr v. U.S. Healthcare*, 22 F.3d 1274, 1279 (3d Cir. 1994)).

The Advisory Committee's notes suggest several factors relevant to any Rule 11 inquiry, including:

> Whether the improper conduct was willful, or negligent; whether it was part of a
> pattern of activity, or an isolated event; whether it infected the entire pleading, or
> only one particular count or defense; whether the person has engaged in similar
> conduct in other litigation; whether it was intended to injure; what effect it had on the
> litigation process in time or expense; whether the responsible person is trained in the
> law; what amount, given the financial resources of the responsible person is needed
> to deter that person from repetition in the same case; what amount is needed to deter
> similar activity by other litigants.

*Lal v. Borough of Kennett Square*, 935 F. Supp. 570, 577 (E.D. Pa. 1996).  A showing of bad faith is

not required; Rule 11 is meant to discourage pleadings that are "frivolous, legally unreasonable, or

without factual foundation," regardless of counsel's intent. *Napier v. Thirty or More Unidentified Fed.*

*Agents*, 855 F.2d 1080, 1090-91 (3d Cir. 1988) (citation omitted). The sanctioned party's conduct need

only be objectively unreasonable. *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*,

278 F.3d 175, 187 n.7 (3d Cir. 2002). Defendant's motion argues that the evidence in Plaintiff's favor

is so weak that Reynolds and Logan violated their duty to allege only colorable claims when they

refused to voluntarily withdraw this lawsuit.

---

> or by a nonfrivolous argument for the extension, modification, or reversal of existing law
> or the establishment of new law;
>
> (3) the allegations and other factual contentions have evidentiary support or, if specifically
> so identified, are likely to have evidentiary support after a reasonable opportunity for
> further investigation or discovery. . . .

So long as the moving party has complied with certain procedures and the court respects specific limitations set forth in
other provisions of the Rule, the court may impose "appropriate sanctions" on the transgressing party. *See* FED. R. CIV.
P. 11(c).

18

This Court generally endorses the principle that the appropriate sanction for weak claims does not always arrive via Rule 11, "but sometimes assumes the more pedestrian form of dismissal or summary judgment." *Emerick v. Norfolk S. Ry.*, No. 03-266, 2006 U.S. Dist. LEXIS 69166, at *9 (W.D. Pa. Sept. 26, 2006). However, the integrity of the adjudicatory process depends in part on the ability to sanction what can be considered nothing but frivolous and unreasonable litigation. *Cf. Robert S. v. City of Philadelphia*, No. 97-6710, 2001 U.S. Dist. LEXIS 13485, **15-16 (E.D. Pa. Aug. 28, 2001) (finding that plaintiff's claims, even if legally unsupportable, could not be called frivolous or unreasonable where there was some supporting evidence).

The Court agrees with Defendant that discovery helped Plaintiff produce remarkably little evidentiary support for his case. Asked to provide some evidence that a triable issue existed in this case, Reynolds has offered nothing but his own self-serving assertions and an affidavit rife with inadmissible hearsay. Moreover, the evidence reveals that Plaintiff's intent to sue was born more from emotion and a thirst for retaliation than from a sense that his rights had somehow been infringed. When MetLife's investigator asked Plaintiff on September 19, 2003, if he recalled telling a female colleague that he wanted to sleep with her, Reynolds angrily threatened to sue Defendant. Document No. 45-13. p. 12. The Court concludes that the case *sub judice* is more the fulfilment of that threat than the product of any reasonable assessment of relevant facts and law. Only in this way can the Court explain why Plaintiff has filed breach of contract actions and tortious interference actions without alleging the existence of a contract, and continued with false light claims based on a letter the contents of which he simultaneously concedes are true.

Defendant's motion for sanctions, as well as its letter relaying an intent to file for sanctions, provided Reynolds and Logan all the notice that due process requires for Rule 11 purposes. *Simmerman*

19

*v. Corino*, 27 F.3d 58, 64 (3d Cir. 1994). Plaintiff had notice that Defendant had moved for Rule 11 sanctions, the grounds for that motion, and the form of sanctions being sought. Plaintiff's Response merely claimed that sanctions were unwarranted because "Plaintiff's claims are not frivolous, and there is evidentiary support for Plaintiff's claims." Document No. 51-1, p. 1. The argument against sanctions is thus a close cousin of the argument against summary judgment, bred on little more than conclusory assertions and deprived of any real sustenance. Accordingly, the Court will grant the Motion for Sanctions and award Defendant the costs associated with its motion for summary judgment on Plaintiff's state law claims.

An appropriate Order follows.

**AND NOW**, this 20th day of February, 2007, after considering Defendant's Motion for Sanctions (Document No. 39), Defendant's Motion for Summary Judgment (Document No. 46), and Defendant's Motion to Strike (Document No. 57), **IT IS HEREBY ORDERED** as follows:

**1)** Defendant's Motion to Strike (Document No. 57) is **GRANTED**. Accordingly, the Reynolds Affidavit placed before the Court at Document No. 50-22 is hereby **STRICKEN** from the record.

**2)** Defendant's Motion for Summary Judgment (Document No. 46) is **GRANTED** in its entirety. Accordingly, the Clerk of Court shall enter judgment in favor of the Defendant and against Plaintiff Charles L. Reynolds as to all counts in the Amended Complaint.

**3)** Defendant's Motion for Sanctions (Document No. 39) is **GRANTED**. Accordingly, Plaintiff Charles L. Reynolds and Attorney James H. Logan shall be equally liable to Defendant

20

for the costs associated with the Defendant's Motion for Summary Judgment against Plaintiff's state-law claims. The Court shall calculate this award using the lodestar approach. *Rode v. Dellarciprete*, 892 F.2d 1177 (3d Cir. 1990).

**a)** Defendant shall file with the Court **on or before March 2, 2007**, an itemized accounting, with evidence, of the costs and attorney fees accrued in connection with the Motion for Summary Judgment against Plaintiff's state-law claims.

**b)** Plaintiff and Plaintiff's counsel shall file with the Court any objections they have to the itemized accounting **on or before March 23, 2007.**

**c)** Plaintiff and Plaintiff's counsel shall also file a brief with the Court **on or before March 23, 2007**, detailing any mitigating circumstances involving either Plaintiff Charles L. Reynolds or Attorney James H. Logan. *Doering v. Union County Bd. of Chosen Freeholders*, 857 F.2d 191 (3d Cir. 1998).

**BY THE COURT:**

**KIM R. GIBSON,**
**UNITED STATES DISTRICT JUDGE**

**Cc: All counsel of record**